**ELIKER, ESTATE OF, In Re**

Ohio Appeals, 2nd Dist, Darke Co.

Nos. 575, 576. Decided June 17, 1940.

466

Murphy & Staley, Greenville; Myers, Mills & Kelly. Dayton, for applicant and appellant, Lawrence Hayes.

Wilbur D. Spidel, Greenville; Richard E. Hole, Greenville, for E. Burres Eliker.

Paul W. Younker, Greenville, for Cemetery Trustee.

Hon. George F. Crawford, Greenville, for Wayne Hospital.

## OPINION

BY THE COURT:

This is an appeal from a judgment of the Common Pleas Court of Darke County, Ohio, acting for the Probate Judge of said county, in refusing to admit to Probate and record a paper writing offered as the last will and testament of Sarah M. Eliker, deceased.

There are four errors assigned.

(1) In the refusal to admit a carbon copy of the will offered for probate.

(2) Erroneous interpretation of the testimony of a witness, Chris Clark.

(3) That the holding of the trial court to the effect that Sarah M. Eliker had testamentary capacity at the time of the destruction of the will is contrary to and against the weight of the evidence.

(4) Error in refusal to admit "to probate and record the destroyed will of Sarah M. Eliker, deceased".

It appears from the record that Sarah M. Eliker, a resident of Darke County, Ohio, died August 14, 1939. In November 1938, she signed the will and testament which was offered for probate in this case. In May, 1939, this will was destroyed upon the direction of the testatrix. The Probate Judge disqualified himself to hear the application for probate and certified the proceedings to the Common Pleas Court which court entered judgment refusing to probate and to admit the proffered will to record.

There are two numbered appeals, No. 575, from the Common Pleas Court and No. 576 from the Probate Court. Two appeals were noted to avoid any procedural difficulty and we consider them as one.

The trial judge in a written opinion, with which we have been favored, held that the proffered will had been legally revoked by the testatrix.

We shall not follow the assignments of error in the order in which they are set forth in the briefs.

At the outset, we are satisfied that sufficient proof was offered to establish for the purpose of probate the due attestation, execution and validity of the will of Sarah M. Eliker, if not revoked, of date that it was signed, namely, November, 1938. **Knepper v Knepper, 103 Oh St 529.**

The pertinent provision of the statute as to admission of a will to probate is §10504-35 GC.

"The Probate Court may admit to probate the last will and testament which it is satisfied was executed according to the provisions of law in force at the time of its execution, and not revoked at the death of the testator, when such original will was lost, spoliated or destroyed subsequent to the death of such testator, or after he became incapable of making a will by reason of insanity, or before the death of such testator, if testator's lack of knowledge of such loss, spoliation or destruction can be proved by clear and convincing testimony, and it cannot be produced in court in as full, ample and complete a manner as the court now admits to probate last wills and testaments, the originals of which are actually produced therein for probate."

It is admitted that the original will was destroyed but not before the death

of the testatrix without her knowledge and that it cannot be produced in court. The operative language, therefore, in this foregoing section with which the trial court was concerned was whether or not the last will and testament proffered had been revoked at the death of the testatrix. It could not be legally revoked if its destruction was made after the testatrix became incapable of making a will by reason of insanity. The method whereby a will may be revoked is set forth in §10504-47 GC.

"A will shall be revoked by the testator tearing, cancelling, obliterating or destroying it with the intention of revoking it, by the testator himself or by some person in his presence or by his express written direction, or by some other will or codicil, in writing, executed as prescribed by this title, or by some other writing, signed, attested and subscribed, in the manner provided by this title for the making of a will, but nothing herein contained shall prevent the revocation implied by law, from subsequent conditions or circumstances of the testator."

The second error assigned is directed to the holding of the trial judge that the testatrix duly revoked the proffered will in a manner prescribed by §10504-47, namely, by the testator tearing it with the intention of revoking it. It will be necessary to a proper consideration of this error to refer to the testimony on the subject. The proffered will and testament was a carefully drawn and somewhat extended instrument consisting of twenty-five items covering four pages of closely typewritten matter. Of the twenty-five items all but seven were dispositive bequests. The proffered will had been executed in November of 1938.

Mrs. Eliker was an elderly woman. At the time of making the proffered will she had one grown son, E. Burres Eliker and at the time of its execution and its destruction she was living at a "Mrs. Carter's Rest Home" in Greenville, Ohio. In May, 1939, following

the execution of the will, Burres Eliker called Chris F. Clark, who had been a witness to the signature of the testatrix to the will, to come over to the Carter Home for a few minutes. When Mr. Clark arrived there were present Burres Eliker, Mrs. Carter and Sarah M. Eliker. Mrs. Eliker was quite deaf, although, Clark testified, a very good lip reader. At page 41, et seq, Mr. Clark testifies,

"Q. And did you see Mr. Burres Eliker when you entered Mrs. Carter's home? A. Yes.

Q. Where was he in reference to the position of Mrs. Eliker? A. In the same room.

Q. In the same room? Did he or did he not tell you why he called you?

A. No, Mrs. Eliker did.

Q. What reason did she assign for calling you?

A. Well, she said that will that I had witnessed, she said she,—had worried her a good bit;—she wanted it destroyed.

Q. Then what followed after her making that statement?

A. She asked Burres to get that box off of the cupboard or whatever it was there,—dresser,—I think it was the will. And so—

Q. I am not following you, Mr. Clark. She asked Burres, you say, to get the box off the cupboard or someplace?

A. It was over,—I don't know whether it was in the box. I think it was then.

Q. Receptacle of some kind?

A. I think it was the envelope representing the will.

Q. Did Burres comply with her request; that is, did he get the box, whatever she asked for? A. Yes.

Q. What did he do with its contents?

A. He handed it to his mother.

Q. Then what followed?

A. She took it out and slightly tore it. She handed it to me, she says, 'now I would like to have this destroyed' and I opened it up and seen the signatures. Of course, that was all that concerned me, and we then put it in a kind of a

box,—I just forget what it was any more—, we took it down in the cellar and put it in the furnace.

Q. We who?

A. That is, Mrs. Carter and Burres Eliker.

Q. Yes? A. And myself.

Q. Mrs. Eliker accompany you down to the basement?

A. No, Mrs. Carter.

Q. Mrs. Eliker remained upstairs?

A. Remained upstairs.

Q. In the room where she was?

A. Yes.

Q. It was handed to you with a request that you destroy it by burning it?

A. Yes.

Q. That is the method so specified, was it, by burning it? A. Yes."

On cross-examination at page 44, et seq. the witness, Clark, testified,

"A. She got up out of her chair (referring to Mrs. Eliker) and handed it (referring to the will) to me.

Q. What did—what did she say concerning that paper at or about that time?

A. Well she said that she wanted this will destroyed. It wasn't just what she wanted.

Q. She did take her will, do you remember, in her own hands.

A. Yes.

Q. What did she do with it in her own hands?

A. She slightly tore it and then handed it to me. I then opened it up, seen the signatures. That is all that I know was in the will.

Q. What did she tell you to do with it?

A. Take it down to the furnace and burn it.

Q. Then did you take it down to the basement?

A. Yes.

Q. You put it in the furnace did you?

A. I put it in the furnace.

Q. And did you look in the furnace to see that it was wholly consumed? A. Yes."

Through this witness there was introduced objector's Exhibit No. 1, which reads as follows:

"Greenville, Ohio,
May 12, 1939.

I, Sarah M. Eliker, of Greenville, Ohio, being of sound mind and desiring to revoke my last will and testament, destroy the same by tearing it in the presence of Christian Clark, who was one of the witnesses who signed the said will, Mrs. Bessie Carter and my son, E. Burres Eliker. I also directed that the said will be burned by the said witnesses to its destruction.

(Signed) Sarah M. Eliker.

We, the undersigned witnesses, in conformity to the directions of Mrs. Sarah M. Eliker, as to the burning of her said will, immediately and in the presence of each other, burned the same by casting it into the furnace fire and thereafter looked into the furnace and saw that it was consumed.

Witness (Signed) Chris F. Clark.

Witness (Signed) Mrs. Bessie Carter.

Witness (Signed) E. Burres Eliker."

It is the claim of appellant that conceding full credit to all of the testimony respecting the destruction of the will, including the instructions of the testatrix prior thereto, her actions in conjunction therewith do not constitute a revocation of the will in any manner provided by law and as specifically set forth in §10504-47 GC. That is to say that she did not tear it with the intention of revoking it. In the language of the brief of appellant it is said.

"Had the tearing been of a sufficient nature to amount to a revocation, if accompanied by the animo revocandi the will ipso facto would have been revoked and Mrs. Eliker's further conduct would have been entirely unnecessary."

It is our judgment that the action of the testatrix in tearing her will in conjunction with that which she said respecting her purpose that it be destroyed and her statement over her own signature that she tore it ■ with the intention of revoking it, was sufficient support for the trial judge to hold that she did legally revoke her will.

The section does not require that the will be so torn as to separate it into parts, or in any particular manner. The tearing, however slight, if done with the intention of revoking the will is sufficient. 68 C. J. 818, citing Re Jones Estate 2 N. P., 190, and cases from California, Illinois, Mississippi, North Carolina, Pennsylvania, South Carolina and England. Obviously the purport of the §10504-47 GC, is to set forth the acts whereby it shall be made certain that a testator not only has the purpose but has accomplished the purpose to revoke her will. If the purpose clearly appear then any of the designated acts in furtherance of the purpose, such as the tearing, cancelling or obliterating of the will, however slight, will be sufficient. From the testimony, as the trial court had the right to find, it appears that the testatrix had a well defined, certain intent that her will be revoked. In furtherance of that intent and with that express purpose she tore the will. In order that its destruction might be complete she then directed that it be burned. Of course, the burning of the will out of her presence in itself did not constitute a revocation but it is a strong circumstance tending to support the conclusion that when she tore it in conjunction with her statements that she desired that it be destroyed, the requisites of the statute had been met. Confirmation of the purpose with which she tore her will is found by its destruction and her reassertion over her own signature that she "destroyed the same (her last will and testament) by tearing it," etc.

The next relevant inquiry, then, would be whether or not at the time of the act of revocation the testatrix had testamentary capacity. We recognize the burden which is upon the proponents of the will to establish that testatrix had insufficient mental capacity to appreciate her act of revocation of the will. On the other hand, the hearing before the trial judge was ex parte and the many witnesses who testified were those only who were offered in behalf of the probate of the will. We appreciate that in a trial where the issue will be the mental capacity of Mrs. Eliker at the time of her destruction of the will and the evidence can be accepted on both sides of that issue, a more correct determination may be made. We must, however, give probative effect to the testimony in the record which is restricted to witnesses which were proffered for the purpose of establishing the mental incapacity of Mrs. Eliker. The three lay witnesses who testified on the subject are corroborative of the opinion of the medical expert that Mrs. Eliker was mentally incapacitated to revoke her will, although, their testimony without more would not support the claim.

Dr. Poland, the medical witness, was especially qualified as an expert in his field to speak upon the subject under consideration. He was Mrs. Eliker's family physician, treated her from January 13, 1939 to May 20, 1939, called on her professionally fourteen times in April and ten times in May, including the first eight days of the month, again on the 12th and 15th and was thereafter discharged. From Dr. Poland's testimony it appears that Mrs. Eliker, past 70 years of age, was practically blind, suffering with cataracts over both eyes, very deaf, had chronic gall bladder disease, kidneys were slightly involved, was senile and suffered from sclerosis of the blood vessels which affected the cerebrum. The doctor's testimony is definite, positive and conclusive, if believed, to the effect that at the very period when the will was destroyed Mrs. Eliker had not the mental capacity to make a will, notably, pages 143a, 148, 149 and 151 of the record. Both on direct and cross

examination he said that she lacked an appreciation of the essentials requisite to testamentary capacity. There is nothing in the record from which we can say that Dr. Poland's testimony should not have been accepted for its probative value.

Upon a careful reading and consideration of this record and a rereading of all of that part which relates to the subject under consideration, we are unable to support the conclusion of the trial judge as to Mrs. Eliker's testamentary capacity when she ordered her will destroyed. It is ▮▮▮▮▮▮ ▮ our judgment that such finding is against the manifest weight of the evidence.

The next claimed error which we consider and numbered first in the assignments of error is, that the court erred in refusing to admit a carbon copy of the proffered will of Sarah M. Eliker which had been in the custody of Orel J. Myers, her attorney who drew the will.

The trial judge having found that the testatrix had revoked her will and that she had testamentary capacity at the time that the act was committed very properly gave no consideration to the question whether or not the subject matter of the proffered will had been sufficiently established. If he had reached this question the testimony of Mr. Myers, the attorney of the testatrix, who drew the will, would have made a marked difference as to the quantum of proof produced as to the establishment of the contents of the will.

The court first admitted the testimony of Mr. Myers, which had the effect of establishing with certainty that the copy which he identified as a true and correct copy of the original will was in all particulars identical with the original. Later, upon further consideration, the court refused to accept this testimony, holding that it was barred because a privileged communication given by the client, the testatrix, to her attorney in that relationship.

It appears that at the time the will sought to be probated was executed there were at least three persons present besides the testator. The two who witnessed the instrument and Mr. Myers. While Dr. Metcalf, one of the witnesses, and Mr. Myers were waiting for the second witness, Chris F. Clark, Mrs. Eliker handed the will to Dr. Metcalf, requested that he look it over and tell her what he thought of it and if he thought it was all right and at that time he read the will.

As Mr. Myers was the attorney for the testatrix there is no question inasmuch as he was not a witness to her[1] will, that he would be precluded from testifying to the contents thereof unless by the foregoing occurrence in the presence of Dr. Metcalf she expressly waived the confidential relationship.

The rule is grounded upon the relation which must be maintained between an attorney and a client and to assure that anything which is divulged by the client to the attorney in that relationship which is confidential, shall be so regarded by the attorney and shall not be testified to unless waived by the terms of the statute.

The disqualification of an attorney from testifying concerning communications made to him by ▮▮▮▮▮▮ ▮ his client in that relation extends to proceedings involving the validity of a will. **Swetland, et v Miles, 101 Oh St 501.** A testator by calling upon her attorney who has prepared the will to act as a ▮▮▮▮▮▮ ▮ witness thereto may testify with respect to the validity of the will as fully as any other subscribing witness. **Knepper et Knepper, Exr., 103 Oh St 530, Collins et v Collins et, 110 Oh St 105. Baird et v Dietrick et, 20 N. P. N. S. 209, 8 Oh Ap 198.**

In **Haley v Dempsey, Exr., 14 Oh Ap 326,** it was held that a client who called upon a law partner of the attorney who drew her will to attest it, did not thereby waive the confidential communications made by her to the scrivener. The court said that the statute requires an express waiver; that where a party

has two lawyers it seems plain on principle that an express waiver as to one is not a renunciation of all of the rights of the person making the confidential communication.

In **Whigham v Bannon, Admr., 21 Oh Ap 496**, 3rd syllabus, it is said,

"Under §11494 GC, communication to attorney in presence of third party is not privileged."

Judge Mauck, who wrote the opinion, discusses the question at length on pages 504, et seq, and quotes from 5 Wigmore on Evidence (2d Ed.) Section 2311,

"The privilege assumes, of course, that communications are made with the intention of confidentiality. The reason for prohibiting disclosure ceases when the client does not appear to have been desirous of secrecy. 'The moment confidence ceases,' says Lord Eldon, 'privilege ceases.' This much is universally conceded * * * One of the circumstances, by which it is commonly apparent that the communication is not confidential is the presence of a third person, not being the agent of either client or attorney."

28 Ruling Case Law, 561, is also cited.

These are practically all of the authorities in Ohio which are helpful on the narrow question here presented.

If the reason for the rule fails the rule must fail.

If at the time that Mr. Myers talked to Mrs. Eliker respecting her wishes and directions as to the contents of her will Dr. Metcalf had been present and heard all of the conversation, it could not successfully be urged that these communications were privileged. When Mrs. Eliker directed Dr. Metcalf in the presence of Mr. Myers to read the items in her will, which it must be assumed were placed there as a result of her directions to Mr. Myers, it was to all intents and purposes the same situation which would have attended had Dr. Metcalf been present when Mrs. Eliker instructed Mr. Myers to prepare her will. The reading of the will and every item thereof by Dr. Metcalf upon the instruction of the testatrix in the presence of Mr. Myers disclosed a purpose to waive any secrecy of communication respecting its contents between the testatrix and her attorney. Had the testatrix called Dr. Metcalf for the purpose only of witnessing her will in the presence of Mr. Myers the effect thereof might have been different. When, however, she chose to acquaint Dr. Metcalf, while in the presence of her attorney, with all of the subject matter of her will we are satisfied that she expressly waived the privilege otherwise assured to her under §11494 GC.

It should be observed that Mr. Myers' testimony was restricted to the contents of the will, as to which the testatrix clearly informed Dr. Metcalf in the presence of her attorney, and did not reach any other or further communication made by the client to her attorney.

The privileged communications respecting the will were waived and the court erred in not permitting Mr. Myers to identify the copy and testify with respect to the contents thereof.

The final assignment, namely, that the court erred in not admitting to probate and record the destroyed will of Sarah M. Eliker, deceased, is determined by our discussion of the assignments relating to the revocation of the will and to the testamentary capicity of the testatrix at the time of the revocation.

The judgment will be reversed.

HORNBECK, PJ., GEIGER & BARNES, JJ., concur.

## APPLICATION FOR REHEARING

Nos. 575-576. Decided July 15, 1940.

BY THE COURT:

Submitted on the following application of appellee, E. Burres Eliker, for a rehearing.

(1) The Court erred in holding that the decision of the trial court to the effect that the decedent had testamentary capacity at the time of revocation was against the manifest weight of the evidence.

A. Because the Court invaded the province of the trial court as the trier of the facts in passing upon the conflicting testimony concerning which the minds of reasonable men could arrive at different conclusions; and in applying the tests of reversibility on questions appealed on questions of law;

B. The Court failed to give any consideration to the presumption of competency and to the presumption that the will had been revoked;

C. The Court refused to apply the test set forth in the case of Cole v McClure, 88 Oh St 1, wherein the Supreme Court of Ohio held that in order to overcome the presumption that a will has been revoked, the evidence must be certain, satisfactory and conclusive that it was unrevoked and in existence after the death of the decedent.

A, B, and C. We accorded to appellees all presumptions to which he was entitled and gave consideration to all questions of burden of proof and recognize that in this case it was incumbent upon the proponents of the will to meet that degree of proof which is set forth in Cole v McClure, 88 Oh St 1.

It is our conclusion as stated in the original opinion at pages 8 and 9 that there is nothing in the record from which we can say that Doctor Poland's testimony should not have been accepted for its probative value. He was the one witness who was qualified to testify as an expert upon the vital questions which determined the testamentary capacity of Mrs. Eliker.

Counsel seems to be under some misapprehension of the scope of the opinion in Chenoweth v Cary, 17 OO 82. In the cited case Judge Geiger was discussing the state of proof required to support the action of the trial court in directing a verdict. The trial court in the instant case was not, nor have we been required to apply the rule governing directed verdicts as there has been no attempt in either court to enter final judgment as a matter of law.

We have held that upon the state of the record there is evidence tending to support the claim of both the proponents and the objectors but that the finding and judgment were manifestly against the weight of the evidence because upon the determinative issue as to testamentary capacity Doctor Poland's testimony stands practically undenied and uncontradicted and there is nothing of consequence in the record affecting his credibility.

In Kelly v Columbus Ry. P. & L. Co., 62 Oh Ap 397, 29 Abs 100, we discussed the difference in the test as to when a verdict shall be directed and a motion for new trial shall be sustained as being against the weight of the evidence.

The application for rehearing will be denied.

HORNBECK, PJ., GEIGER & BARNES, JJ., concur.